[Cite as *Dutton v. Dutton*, 2025-Ohio-1980.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Carrie E. Dutton, :

      Plaintiff-Appellant, :

                                          No. 24AP-286
v. :
                                        (C.P.C. No. 22DR-1857)

Thomas E. Dutton, : (REGULAR CALENDAR)

      Defendant-Appellee. :

---

D E C I S I O N

Rendered on June 3, 2025

---

**On brief:** *Giorgianni Law LLC*, and *Paul Giorgianni*, for appellant. **Argued:** *Paul Giorgianni*.

**On brief:** *Grossman Law Offices, Andrew S. Grossman*, and *John H. Cousins*, for appellee. **Argued:** *John H. Cousins*.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

BOGGS, J.

{¶ 1} Plaintiff-appellant, Carrie E. Hardie (formerly, Carrie E. Dutton), appeals a Qualified Domestic Relations Order ("QDRO") issued by the Franklin County Court of Common Pleas, Division of Domestic Relations, in her action for divorce from defendant-appellee, Thomas E. Dutton. However, we dismiss this appeal because Carrie did not file a timely appeal of the underlying divorce decree, the QDRO is not an independent final order, and Carrie has not sought a finding or resolution of ambiguity in the divorce decree from the trial court.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2} This appeal concerns the trial court's distribution of a single, albeit significant, asset—Thomas's defined-benefit pension plan (the "Plan") sponsored by the

Jones Day law firm, of which Thomas is a partner. Thomas entered the Plan in 1992. The plan offers a lifetime monthly benefit upon retirement.

{¶ 3} Carrie and Thomas married in November 2011. It was a second marriage for both. Thomas's previous marriage to Susan Dutton was dissolved in 2010, and as part of the dissolution, Susan was awarded 50 percent of Thomas's vested accrued benefit in the Plan as of October 15, 2010, payable at Thomas's normal retirement age. A QDRO recognizing Susan's interest in the Plan stated that Thomas "shall have no authority or rights with respect to [Susan's] Benefit[.]" (Pl.'s Ex. 63 at 8.) Carrie does not dispute that Susan is entitled to $34,453.86 per year under the Plan.

{¶ 4} Carrie filed for divorce from Thomas in 2022. After a multiday trial, the trial court issued a judgment entry/decree of divorce ("divorce decree") on February 2, 2024. In the divorce decree, the trial court described the Plan and its status as marital or separate property:

> [Thomas] has an interest in the Jones Day Qualified Defined Benefit Plan. The portion of this retirement plan earned prior to the marriage and any accruals thereon are [Thomas's] separate property. All benefits earned and accruals thereon after the date of the parties' marriage through June 30, 2022 are marital.

(Feb 2, 2024 Jgmt. Entry/Decree of Divorce at 17.) The trial court noted in the divorce decree that the Plan is "subject to a QDRO which has been issued on behalf of [Susan] for the annual amount of $34,454." *Id.* Carrie agrees that Susan's share of the Plan is not marital property as between Carrie and Thomas.

{¶ 5} At trial, the parties and their respective experts disagreed about the method the trial court should employ to divide the value of the Plan between marital property and Thomas's separate property. Thomas and his expert, Al Minor, advocated for application of a traditional coverture formula to determine the portion of the Plan's value that is marital property, while Carrie and her expert, James Myers, argued that applying a traditional coverture formula would not be an equitable division of the Plan's value, because benefits under the Plan did not accrue evenly from year to year. Myers described his alternative proposal as "coverture based on what accrued during the marriage," rather than "coverture using years." (Dec. 13, 2023 Tr. Vol. 3 at 315.) Minor testified that he had never seen a

benefit divided the way Myers suggested, and he described Myers's proposal as "[n]ovel." *Id*. at 499.

{¶ 6} The trial court rejected Carrie's argument, concluding that Myers's method for dividing the Plan "would be inequitable" and finding that "the standard coverture fraction is appropriate" for determining the marital portion of the Plan. (Jgmt. Entry/Decree of Divorce.)  The trial court ordered:

> [Carrie] is awarded one half the marital portion of [Thomas's] interest in the Jones Day Qualified Retirement Plan by the following formula: Fifty Percent (50%) of a fraction, the numerator of which is the number of full months of [Thomas's] credited service in the Plan earned during the marriage (from November 12, 2011 to June 30, 2022), and the denominator of which is the total number of months of [Thomas's] credited service participation in the Plan as of the earlier of his date of cessation of benefit accruals or the date that [Carrie] commences her benefits hereunder. . . .  This Order shall not require the payment of any benefit[s] to [Carrie] which are required to be paid to another Alternate Payee under another Order previously determined to be a Qualified Domestic Relations Order (QDRO).  [Thomas] shall retain any remaining interest he may have in the plan except as may otherwise be assigned by QDRO to Susan M. Dutton.

*Id*. at 38-39.  The trial court ordered Thomas to prepare a QDRO "as proposed by the Jones Day Qualified Defined Benefit Plan Model QDRO with changes/inclusions as specifically ordered" in the divorce decree.  *Id*. at 39.  The trial court reserved jurisdiction to amend any QDRO issued pursuant to the divorce decree for purposes of establishing or maintaining its status as a QDRO.  *Id*.  Neither Carrie nor Thomas appealed the divorce decree.

{¶ 7} The parties filed no motions in the trial court with respect to the content of a QDRO to enforce the divorce decree, and the trial court adopted the QDRO proposed by Thomas on April 1, 2024.[1]  Consistent with the divorce decree, Section 5 of the QDRO sets forth the coverture fraction applicable to the Plan and states, in relevant part:

> [Carrie] is assigned **Fifty Percent (50%)** of the marital portion of [Thomas's] vested accrued benefit under the Plan as of the earlier of the date of [Thomas's] cessation of benefit accruals or the date [Carrie] commences benefits hereunder[.] The marital portion shall be determined by using a fraction, the

---

[1] Although captioned "*Stipulated* Qualified Domestic Relations Order," the signature block on the QDRO lacks a signature from either Carrie or her counsel.  (Emphasis added.)

numerator of which is the number of full months of [Thomas's] credited service in the Plan earned during the marriage (**from November 12, 2011 to June 30, 2022**), and the denominator of which is the total number of full months of [Thomas's] credited service in the Plan as of the earlier of the date of [Thomas's] cessation of benefit accruals or the date [Carrie] commences benefits hereunder.

(Emphasis in original.) (Apr. 1, 2024 QDRO at 2-3.)

{¶ 8} Carrie filed a notice of appeal of the QDRO on April 29, 2024. Nearly a month later, she filed in the trial court a proposed QDRO, which she claims to have originally submitted to the trial court on March 29, 2024, and which she claims the trial court rejected on April 1, 2024. The only difference between Carrie's proposed QDRO and the QDRO that the trial court adopted is the addition of a single sentence in Section 5 of Carrie's proposed QDRO, which states that, for purposes of determining the marital portion of the Plan, "the 'vested accrued benefit' shall be [Thomas's] benefit prior to the reduction due to a QDRO related to [Thomas's] previous marriage." (May 28, 2024 Stipulated Qualified Domestic Relations Order at 2.)

{¶ 9} Carrie presents a single assignment of error for this court's review: "The Domestic Relations Court erred by rejecting Carrie's proposed QDRO and adopting Thomas's proposed QDRO." (Appellant's Brief at v.)

## II. ANALYSIS

### A. Division of retirement benefits and use of a QDRO

{¶ 10} Pension or retirement benefits earned during a marriage are marital assets, which a trial court must consider as part of the property division in a divorce. *Wilson v. Wilson*, 2007-Ohio-6056, ¶ 5, citing *Hoyt v. Hoyt*, 53 Ohio St.3d 177, 178-179 (1990). The trial court recognized, and neither Thomas nor Carrie disputes, that a portion of Thomas's interest in the Plan—"[a]ll benefits earned and accruals thereon after the date of the parties' marriage through June 30, 2022"—is marital property. (Jgmt. Entry/Decree of Divorce at 17.) On the other hand, the portion of Thomas's interest in the Plan earned prior to Thomas and Carrie's marriage and any accruals thereon is Thomas's separate property. *Id.* The trial court awarded Carrie "one half the marital portion of [Thomas's] interest in the [Plan]." *Id.* at 38.

{¶ 11} As previously mentioned, the parties' experts proposed different methods for calculating the marital portion of the Plan. The trial court agreed with Minor, Thomas's expert, that "the standard coverture fraction is appropriate" for determining the marital portion of the Plan. (Jgmt. Entry/Decree of Divorce at 17.) Application of the traditional coverture method of dividing vested, but unmatured, pension benefits "begins with a calculation of the value of the pension at the time of the [participant-spouse's] retirement." *Johnson v. McCarthy*, 2019-Ohio-3489, ¶ 18 (10th Dist.), citing *Cameron v. Cameron*, 2012-Ohio-6258, ¶ 18 (10th Dist.) and *Thompson v. Thompson*, 2011-Ohio-6286, ¶ 33 (10th Dist.). That value is then multiplied by a coverture fraction, the numerator of which "is the number of years the participant spouse was employed during the marriage, and the denominator is the number of years of total employment." *Id.* The resulting amount is the marital portion of the benefit. *Id.* Minor testified that, applying a coverture fraction with a numerator of 10.6326, representing Thomas's years of participation in the Plan during his marriage to Carrie, and a denominator of 30, representing Thomas's total years of participation in the Plan should he retire after 30 years, 35.44 percent of the benefit under the Plan would be marital property to be divided between the parties. (Tr. at 539-541.)

{¶ 12} The trial court ordered that the marital portion of the Plan be determined by application of a coverture fraction, "the numerator of which is the number of full months of [Thomas's] credited service in the Plan earned during the marriage (from November 12, 2011 to June 30, 2022), and the denominator of which is the total number of months of [Thomas's] credited service participation in the Plan as of the earlier of his date of cessation of benefit accruals or the date that [Carrie] commences her benefits hereunder." (Jgmt. Entry/Decree of Divorce at 38-39.) Application of the coverture fraction ensures that the portion of the Plan earned prior to Thomas and Carrie's marriage remains Thomas's separate property. *See id.* at 17 ("The portion of this retirement plan earned prior to the marriage and any accruals thereon are [Thomas's] separate property."). Although not what she requested at trial, Carrie does not challenge on appeal the trial court's order that the marital portion of the Plan be determined by application of the standard coverture fraction and formula.

{¶ 13} In the divorce decree, the trial court ordered Thomas to prepare a QDRO "as proposed by the Jones Day Qualified Defined Benefit Plan Model QDRO with

changes/inclusions as specifically ordered herein." *Id.* at 39. Private pension plans that qualify under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001, et seq., are subject to restrictions, including that benefits may not be assigned or alienated other than through a QDRO. *Taylor v. Taylor*, 44 Ohio St.3d 61, 62 (1989), citing 29 U.S.C. 1056(d)(3). A QDRO "is an order 'which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternative payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan.' " *State ex rel. Sullivan v. Ramsey*, 2010-Ohio-252, ¶ 18, quoting 29 U.S.C. 1056(d)(3)(B)(i)(I) and 26 U.S.C. 414(p)(1)(A)(i). " 'The QDRO must be drafted to include very specific information with explicit instructions to the plan administrator. It is then the responsibility of the plan administrator to review the order . . . and determine whether it constitutes a QDRO pursuant to Section 414(p), Title 26, U.S.Code.' " (Footnote omitted.) *Id.*, quoting *Hoyt* at 180. The QDRO "serves as a bridge between the broad strokes of a divorce decree and the intricate mechanics of pension-plan administration." *Shaw v. Shaw*, 2024-Ohio-3231, ¶ 15 (12th Dist.), citing *McKinney v. McKinney*, 142 Ohio App.3d 604, 608 (2d. Dist. 2001).

### B. The divorce decree was a final appealable order from which no timely appeal was taken

{¶ 14} Carrie's arguments on appeal concern the value which must be multiplied by the coverture fraction described in the divorce decree to determine the value of the marital portion of the Plan. The thrust of her assignment of error is that the divorce decree required calculation of the marital portion of the Plan by application of the coverture fraction without first deducting the value allocated to Susan in the dissolution of Thomas and Susan's marriage.

{¶ 15} Before we may address the merits of Carrie's assignment of error, we must first consider whether this matter is properly before us. Thomas argues that Carrie's arguments are untimely and barred by the doctrine of res judicata, because Carrie did not appeal the divorce decree within 30 days, and also because Carrie has not preserved her arguments by raising them in the trial court. We agree in part.

{¶ 16} "[A] divorce decree that provides for the issuance of a QDRO is a final, appealable order, even before the QDRO is issued." *Wilson*, 2007-Ohio-6056, at ¶ 20. It is the "divorce decree [that] completely divides the property," *id.* at ¶ 19, "constitutes the final determination of the court[,] and determines the merits of the case," *id.* at ¶ 16. A QDRO

issued thereafter "is merely a tool used to execute the divorce decree." *Id.* at ¶ 19. The " 'QDRO may not vary from, enlarge, or diminish the relief that the court granted in the divorce decree.' " *Id.* at ¶ 18, quoting *Lamb v. Lamb*, 1998 Ohio App. LEXIS 6007, *2 (3d Dist. Dec. 4, 1998). A trial court "has control over the division of property at the time of the divorce decree, but not thereafter." *Thomas v. Thomas*, 2001 Ohio App. LEXIS 1883, *9 (10th Dist. Apr. 26, 2021).

{¶ 17} Timely filing of a notice of appeal is a jurisdictional requirement, and a party's failure to file a timely notice of appeal precludes an appellate court from entertaining an appeal. *Moldovan v. Cuyahoga Cty. Welfare Dept.*, 25 Ohio St.3d 293, 294-295 (1986). Pursuant to *Wilson*, the February 2, 2024 divorce decree, which fully provided for the division of the Plan, was a final appealable order. A timely appeal of the trial court's division of the Plan, as set out in the divorce decree, would have to have been filed within 30 days after the issuance of the divorce decree—by March 4, 2024. *See* App.R. 4(A). Because Carrie did not file a notice of appeal within 30 days after the issuance of the divorce decree, an appeal of any error contained in the divorce decree is untimely. This would include a challenge to the trial court's decision that the marital portion of the Plan be determined by application of the traditional coverture fraction, as proposed by Thomas's expert.

## C. The QDRO is not an independent final order from which Carrie may appeal

{¶ 18} The absence of a timely notice of appeal from the divorce decree alone does not resolve the propriety of this appeal. As previously stated, Carrie does not challenge the trial court's decision to divide the Plan by using the traditional coverture fraction, nor does she challenge the express contents of the divorce decree; at best she claims that the divorce decree is ambiguous, inasmuch as it did not identify the value to be multiplied by the coverture fraction to determine the marital portion of the Plan, and/or that the subsequently issued QDRO improperly modified the divorce decree. Carrie, in fact, specifically claims she is not appealing the divorce decree but is only appealing the subsequently issued QDRO. Thus, the question becomes whether the QDRO is itself a final appealable order, separate from the divorce decree. We hold that it is not.

{¶ 19} As the Third District Court of Appeals has stated, a QDRO is not a final appealable order when it "merely mimics" the divorce decree that it is meant to implement, because it does "not affect a substantial right of the parties." *Lamb* at *2. *See also Haddox*

*v. Haddox*, 2022-Ohio-3500, ¶ 48 (6th Dist.) (dismissing as untimely and as barred by res judicata an appeal of a Division of Property Order ("DOPO"), which "did not constitute a further adjudication of the merits as to the issues" raised in the appeal).[2]  A party *may* appeal a QDRO that does not accurately implement the divorce decree, *see Zorn v. Zorn*, 2008-Ohio-2391, ¶ 12 (9th Dist.), citing *Miller v. Miller*, 2008-Ohio-2106, ¶ 15 (9th Dist.), because a QDRO that modifies a divorce decree is void for lack of jurisdiction, *Butcher v. Butcher*, 2011-Ohio-2550, ¶ 12 (8th Dist.).  The relevant question is whether the QDRO "merely enforced the decree or instead impermissibly modified it." *Cameron*, 2012-Ohio-6258, at ¶ 29.  In *Cameron*, because the DOPO simply enforced the divorce decree, we held that the appellant was required to raise her challenges in an appeal of the original decree and not of the DOPO. *Id.* at ¶ 31.

**{¶ 20}** Carrie acknowledges in her appellate brief that her assignment of error "rests on the proposition that the QDRO conflicts with the divorce decree," but she identifies no actual conflict between the terms of the divorce decree and the terms of the QDRO. (Appellant's Brief at 13.)  In her reply brief, she argues, "the divorce decree does not carve out [Susan's] $34,453.68 from the multiplicand of the coverture formula.  It is only the QDRO that (according to Thomas and Jones Day) does that." (Reply Brief at 14.)  In fact, *neither* the divorce decree *nor* the QDRO, by its express terms, addresses the value to which the coverture fraction should be applied, *i.e.*, the multiplicand in the coverture formula, despite testimony at trial regarding the treatment of the benefit previously awarded to Susan.  Neither states whether the coverture fraction should be applied to the full value of the Plan attributable to Thomas's service or whether the portion of the benefit payable to Susan should first be deducted before applying the coverture fraction.

**{¶ 21}** It is only by relying on assumptions about the meaning of the divorce decree and/or the QDRO that Carrie maintains there is a conflict between the two.  The divorce decree awards Carrie one-half the marital portion of Thomas's "interest in" the Plan (Jgmt. Entry/Decree of Divorce at 38), while the QDRO assigns to Carrie one-half the marital

---

[2] *Haddox* involved a DOPO, an order that is used to divide a public-employee pension, not a QDRO.  Courts treat the two types of orders the same with respect to finality.  *Haddox* at ¶ 46.  This court has stated, "To effectuate and enforce the divorce decree's division of pension benefits, a domestic relations court enters an order such as a [QDRO], a DOPO, or similar device." *Cameron*, 2012-Ohio-6258, at ¶ 12. *See also Reeves v. Reeves*, 2016-Ohio-4590, ¶ 9 (12th Dist.) ("While the issue in the case at bar is the future execution of a DOPO, rather than a QDRO, the reasoning remains the same and is not changed merely because the DOPO is specific to a state pension where the QDRO divides private pensions.").

portion of Thomas's "vested accrued benefit under" the Plan (QDRO at 2), both to be determined by application of the coverture fraction, but neither the divorce decree nor the QDRO defines those terms. Carrie states, "The only logical construction of the divorce decree's award of the Benefit is that the multiplicand in the coverture formula is the entire Benefit. To the extent the QDRO provides otherwise, the QDRO must be reversed." (Appellant's Brief at 13.) To find a conflict between the divorce decree and the QDRO, this court would have to not only presume that the divorce decree required the full value of the Plan attributable to Thomas's years of participation be multiplied by the coverture fraction, but also that the QDRO contrarily requires the deduction of Susan's interest before applying the coverture fraction. We may not do so. Neither Carrie's assumptions nor Jones Day's suggestion that it will subtract the value of Susan's portion of the Plan before applying the coverture fraction[3] creates a conflict between the divorce decree and the QDRO when no conflict appears in the plain language of those documents.

{¶ 22} The QDRO implements the divorce decree without any variation from the divorce decree's terms, and any ambiguity about whether the multiplicand to be used when applying the coverture formula includes or excludes the value previously awarded to Susan stems first from the divorce decree. Because the QDRO merely mimics the divorce decree, it is not an independent final order from which Carrie may appeal.

### D. Carrie's request for a remedy must be directed to the trial court

{¶ 23} Carrie goes on to ask this court to determine whether Susan's benefit under the Plan should be deducted before applying the coverture fraction even if there is no conflict between the divorce decree and the QDRO. But even beyond the absence of a timely appeal from a final appealable order, which precludes this court from doing so, we note that Carrie has not raised an issue regarding ambiguity in the divorce decree in the trial court by filing, for example, a motion for clarification. Thus, even were this matter properly before this court, it is well-settled that " '[a] party cannot assert new arguments for the first time on appeal.' " *State ex rel. White v. Aveni*, 2024-Ohio-1614, ¶ 22, quoting *Fields v. Zanesville Police Dept.*, 2021-Ohio-3896, ¶ 31 (5th Dist.).

---

[3] Thomas's appellate brief states, "Jones Day, as plan administrator, in furtherance of the QDRO, has advised both Carrie and Tom that it will apply the coverture formula to Tom's accrued benefit and only Tom's accrued benefit because, since the 2010 QDRO, Susan and Tom have had separate and distinct accrued benefits under the plan." (Appellee's Brief at 18.)

{¶ 24} That is not to say that Carrie lacks a remedy, but any such remedy lies first with the trial court. Once a trial court has made an equitable property division in a divorce or dissolution, the court has no authority to modify its decision, R.C. 3105.171(I), but it does have " 'the power to clarify and construe its original property division so as to effectuate its judgment,' " *Green v. Green*, 2006-Ohio-2534, ¶ 25 (10th Dist.), citing *Gordon v. Gordon*, 144 Ohio App.3d 21, 24 (8th Dist. 2001). "When the parties 'dispute, in good faith, the meaning of a provision in a decree, or if the provision is ambiguous, the trial court has the power to hear the matter, to resolve the dispute, and to enforce the decree.' " *Cameron* at ¶ 11, quoting *Robins v. Robins*, 2005-Ohio-4969, ¶ 13 (10th Dist.). "If it determines an ambiguity exists, a court 'has the power to clarify and construe its original property division so as to effectuate its judgment.' " *Id.*, quoting *Borzy v. Borzy*, 2001-Ohio-1871 (9th Dist.).

{¶ 25} Although, as a final judgment, a divorce decree " 'is res judicata as to all issues adjudicated in the divorce action[,] . . . this does not mean that a divorce decree may not be interpreted or clarified.' " *Moore v. Moore*, 2014-Ohio-1920, ¶ 31 (10th Dist.), quoting *Dorsky v. Dorsky*, 1981 Ohio App. LEXIS 14072, *15 (8th Dist. Dec. 10, 1981). The parties here dispute what value the coverture fraction is to be applied to, and particularly whether that value includes the value previously assigned to Susan. Resolution of that dispute turns on the meaning of Thomas's "interest in" the Plan, which is undefined in the divorce decree. (Jgmt. Entry/Decree of Divorce at 38.)

{¶ 26} Thomas argues that the divorce decree "made clear" that the coverture fraction applies to a value that excludes Susan's portion of the plan, but the divorce decree is not as clear as Thomas maintains. Indeed, it states that Thomas "shall retain any remaining interest he may have in the plan *except* as may otherwise be assigned by QDRO to Susan M. Dutton." (Emphasis added.) (Jgmt. Entry/Decree of Divorce at 39.) That language at least suggests that the interest previously assigned to Susan is part of Thomas's "*remaining* interest" *after* application of the coverture fraction to determine the marital portion of the plan vis-à-vis Thomas and Carrie. Nor do Thomas's citations to federal statutes and regulations demonstrate that the divorce decree is facially unambiguous. Nevertheless, this court may not determine in the first instance whether the divorce decree is ambiguous, nor may we resolve any such ambiguity at this juncture. *See Borzy* at *5, citing *In re Dissolution of Marriage of Seders*, 42 Ohio App.3d 155, 156 (9th Dist. 1987);

*McClosky v. McCloskey*, 2024-Ohio-1900, ¶ 28 (2d Dist.) (recognizing that courts of appeals will review a trial court's clarification of ambiguous language in a divorce decree for an abuse of discretion). Carrie must first allow the trial court to make those determinations.

**III.  CONCLUSION**

{¶ 27} Because an appeal from the divorce decree would be untimely, because the QDRO is not an independent final order, and because Carrie has not sought a finding or resolution of ambiguity in the divorce decree from the trial court, we conclude that Carrie's sole assignment of error and her arguments in support thereof are not properly before this court.  Accordingly, we dismiss this appeal.

*Appeal dismissed.*

MENTEL and LELAND, JJ., concur.

————————————